## TEXAS EMPLOYERS' INS. ASS'N v. SHELTON.

### No. 6114.

Court of Civil Appeals of Texas.   Amarillo.

Nov. 6, 1950.

Rehearing Denied Dec. 4, 1950.

Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, (H. A. Berry, Amarillo of counsel), for appellant.

Walter E. Rogers and J. E. Thompson, Pampa, for appellee.

PITTS, Chief Justice.

This is a venue suit in which appellee, Pat H. Shelton, sued appellant, Texas Employers' Insurance Association, seeking to set aside a compromise settlement agreement because of alleged fraud perpetrated by appellant through its agent upon appellee in Gray County, Texas. Appellant filed its plea of privilege alleging that it was a quasi-public corporation with its principal office and place of business situated in Dallas County, Texas, where it sought to have the suit transferred. Appellee filed a verified controverting plea alleging venue in Gray County under either Subdivision 7 or Subdivision 23 of Article 1995, R.C.S., Vernon's Ann.Civ.St. art. 1995, subds. 7, 23, and the issue of venue was heard by the trial court without a jury. The plea of privilege was overruled and appellant has perfected its appeal.

Appellant predicates its appeal upon three points of error contending that appellee's pleadings and the evidence heard do not support a cause of action authorizing venue maintainable in Gray County under either of the alleged Subdivisions of Article 1995.

In a venue suit the plea of privilege and the controverting plea constitute the pleadings. A controverting plea may, by the use of appropriate language, make plaintiff's original petition a part thereof without copying the same therein. Cogdell v. Martin, Tex.Civ.App., 176 S.W.2d 982. In his controverting plea appellee expressly adopted the pleadings of his original petition and made them a part of his said plea and in the affidavit to the said plea made by his attorney they were all verified as being true and correct. Appellee alleged a fraudulent procurement of his signature to a purported compromise settlement agreement by appellant's agent. He pleaded that the false and fraudulent representations were made to his damages and alleged that they were made by appellant's agent to him at his home in Gray County, Texas, where the purported settlement was likewise signed, and he urges that the court of Gray County has venue. It is our opinion that appellee's pleadings are sufficient under the law to maintain venue in Gray County. Bell v. Twaddell, Tex.Civ.App., 45 S.W.2d 697.

Subject to its plea of privilege appellant denied appellee's allegations contained in his original petition but nowhere does the record reveal any complaint made by appellant in the trial court about appellee's pleadings being insufficient to sustain venue in Gray County. It appears that such a complaint was made for the first time on appeal in this court. It has been held in such cases that by a failure to call the trial court's attention to any alleged defect in appellee's controverting plea before the rendition of judgment overruling a plea of privilege, appellant has waived his right on appeal to question the sufficiency of such a controverting plea. Robinson v. Glasse, Tex.Civ.App., 188 S.W.2d 598. It is our opinion that appellee's pleadings are sufficient but for the reasons stated appellant should not now be heard for the first time to complain if they are not sufficient.

Appellee is here charged with the burden of proving his claims of venue but he is required only to establish by a preponderance of the evidence the necessary elements of fraud to the satisfaction of the trial court, the trier of facts. If he has done that, he has met the requirements of the law.

In response to appellee's request for admissions of fact made in connection with this case, appellant has admitted that it maintains an office in Amarillo, Potter County, Texas, and employs agents and adjusters who work out of such office in Gray County, Texas, and other counties in this area; that M. O. Voorhies, one of such agents, worked on claims against appellant in Gray County, Texas; that the said agent had authority to investigate claims against appellant and to obtain statements from claimants and witnesses and also from doctors concerning the condition of claimants

and the extent of their injuries; that the said agent had authority to discuss claims and propose settlements with attorneys for claimants and that he did do so; that the said agent had authority to discuss with claimants medical reports and other information in his employer's file; that the said agent likewise had authority to negotiate with claimants in the adjustment of claims against appellant and had authority to obtain and accept releases from claimants and to procure and accept settlement agreements from claimants; that the said agent had authority to settle claims in an amount not to exceed a sum fixed by appellant and subject then to the approval of the Industrial Accident Board and that the said agent did effect numerous settlements, which had been paid; that the said agent had been hired and was paid by appellant for his services rendered on or about January 1, 1950.

The record reveals that appellee was 68 years of age and had a claim against appellant as the insurer as a result of an injury appellee had sustained while employed by J. E. Carlson, Inc., at a wage rate of $46 per week and compensation rate of $25 per week; that appellee was totally incapacitated for a time as a result of the injury and had not worked any from December 20, 1949, to the date of the trial of this case on June 23, 1950, which was a little more than 26 weeks. On December 28, 1949, at the request of appellant's agent, M. O. Voorhies, appellee signed at Pampa, Gray County, Texas, an instrument designated as a "compromise settlement agreement", which reflected that appellee had sustained an injury and had lost time from work only from December 20, 1949, to January 16, 1950; that his weekly wage rate was $46 and his compensation rate $25; that no compensation had been paid to appellee; that appellee agreed to compromise and accept the sum of $250 in full settlement of his claim against appellant, subject to the approval of the Industrial Accident Board. The instrument shows to have been received by the Industrial Accident Board on January 5, 1950, which Board on the same day made the following statement over the name "Flewellen": "The Board finds, the

liability of the insurance carrier, or the extent of the injuries of the employee, is uncertain, indefinite and incapable of being satisfactorily established."

The Board nevertheless approved the same because it purported to be a compromise settlement and bore the approval of the parties concerned, namely, Pat H. Shelton and Texas Employers' Insurance Association by M. O. Voorhies, witnessed by Beatrice Shelton, appellee's wife. However, a compromise settlement receipt was thereafter requested by the Industrial Accident Board but the same was never executed by appellee.

As evidenced by appellant's admissions filed in this case, its agent M. O. Voorhies was a man of business ability, experienced and well versed particularly in matters concerning claims for compensation settlements and releases; while appellee and his wife were unschooled, never had any previous experience with compensation claims or settlement agreements or with any other kind of contracts, and knew little, if anything, about the law governing such. On December 28, 1949, appellant's said agent went to the home of appellee in Gray County, Texas, while appellee was confined to his bed as a result of his injuries and there obtained from appellee the compromise settlement agreement heretofore referred to.

Appellee Shelton testified, in substance and in effect, that on the said date appellant's agent, Mr. Voorhies, came to his home in Gray County where he was confined to his bed as a result of his injuries, represented himself to be an insurance man, took a typewriter from its case, began to ask appellee questions about his age, employment, injuries, wage rate and at the same time wrote on the typewriter as he obtained such information; that the said agent told appellee that the doctor said he must have a brace for his back and that he (agent) would furnish the money to pay for the brace and to pay appellee's expenses to go have it made if appellee was sent away somewhere by the doctor to have the brace made; that the said agent then went next door to use a telephone but soon returned and told appellee that the doctor said he

would order the brace and put it on appellee himself; that the agent said it would take ten days to get the brace and appellee would have to wear it three or four weeks; that agent then sat and studied a little bit and said, "That will be about five weeks, but I'll give you a little to play on and make it eight weeks and I'll send you a check for $250 of which sum $48 will be used for your brace and you may live on the remainder until we find out what is the matter with you and how you will get along"; that agent then wrote more on the typewriter, after which he slipped the paper out of the typewriter and got appellee's glasses and a pencil for him to sign the said paper; that appellee raised up in bed, turned and sat on the side of the bed and reached for the instrument agent had taken from the typewriter and was then holding in his hand to look it over when agent jerked the paper away and said, "I'll just read it to you"; that agent then read to appellee only that part of the instrument concerning appellee's age, nature of his work, about his injuries and wage rate (just the matters about which agent had been asking appellee) but agent did not read all of the instrument or any part of it pertaining to a settlement of appellee's claim, the terms of such or any other part of the purported agreement but he did say he would see that all doctor bills were paid; that agent then placed the instrument on top of the other papers, then held it on appellee's knee as appellee sat on the side of the bed and agent then said to appellee, "You sign on that line there", but appellee asked agent why and what it was for; that agent replied that, "You will have to sign that to get the money to pay for your brace and the other $200 is for you to live on until we find out how bad you are hurt and how you are going to get along"; that appellee then asked agent if that would be all the compensation he would get and agent replied, "No, you will draw compensation as long as you are not able to work"; that, after these representations were made to appellee by appellant's said agent, appellee then signed the instrument, relying upon the representations of the said agent made to him and without knowing he was signing a compromise settlement of any

character; that agent held on to the instrument the whole time and kept all of its provisions covered up while appellee was signing it except the line for appellee's signature and one or two lines above it. Appellee further testified that appellant's said agent then handed the instrument to appellee's wife, who was present during all of the transactions heretofore related, and asked her to sign the same as a witness; that appellee's wife looked at the instrument and asked agent what the words "compromise settlement" at the top of the same meant and agent replied, "That means I am going to give you some money to live on until we see how bad Mr. Shelton is hurt, and how he is going to get along"; that appellee's wife then asked agent, "Will he still continue to draw compensation?" And agent replied, "He will draw compensation as long as he is not able to work", after which appellee's wife signed the instrument as a witness; that agent then took all the papers and left immediately thereafter without leaving anything with appellee to show what he had signed and the agent said as he left, "You will get some money in about ten days"; that agent did not tell appellee at any time why he was there or say anything about settling a claim; that appellee at no time agreed to make a settlement of his claim against appellant and that such a proposal was never made to him; that appellee did not know the instrument he had signed was a settlement agreement until several days later when he received a letter from the Industrial Accident Board wanting him to sign a final release and he presented his letter and other papers to his present attorney in this case.

Appellee's wife testified corroborating the testimony given by appellee concerning the material facts. Their testimony was not controverted and no effort was made to controvert it. Appellant contends, however, that appellee signed the instrument knowing it was a compromise settlement agreement. But the evidence does not support such a contention. On the contrary, the evidence refutes such a contention. The evidence reveals that appellee was not permitted to examine the instrument before

signing it, that nothing was said about it being a compromise settlement before he signed it and that he did not know such instrument was a compromise agreement settlement until several days after it had been signed. The evidence does reveal that appellee's wife asked appellant's agent what the term "compromise settlement" meant after appellee signed it and before she signed it, but the said agent did not then tell appellee and his wife what the term means. He did tell them, however, that it meant they would get enough money to live on until they could determine how badly appellee was injured and he further told them according to the evidence that appellee would draw compensation so long as he was unable to work. It can be reasonably presumed that appellee and his wife did not know the meaning of the term "compromise settlement" at any rate.

No findings of fact or conclusions of law were filed and none were requested in so far as the record reveals. In the absence of such the reviewing court must presume that the trial court resolved every issue in support of the judgment and the reviewing court must also examine the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the appellee. Trigg v. Fambro, Tex.Civ.App., 184 S.W.2d 666; Dallas Joint Stock Land Bank of Dallas v. Harrison, Tex.Civ.App., 131 S.W.2d 742; Sharp v. Mead, Tex.Civ.App., 127 S.W.2d 510; Miller v. Flynn, Tex.Civ.App., 279 S.W. 879, and other authorities cited by these cases.

The uncontroverted evidence was amply sufficient to warrant the trial court in finding that a cause of action had been shown and presented by appellee on the alleged issues of fraud and in concluding that venue is therefore maintainable in Gray County, Texas, and it is presumed that the trial court did so find and conclude.

Under the authorities previously cited it has been held that an appeal from a judgment in a case such as this will not be disturbed where there is enough evidence to raise the alleged issues of fact sufficiently to establish venue. It has likewise been held that where plaintiff has established one of two grounds of venue relied on, the other becomes immaterial. Super-Cold Southwest Company v. Green & Romans, Tex.Civ.App., 185 S.W.2d 749.

It is our opinion, after a careful examination of the record and the briefs presented, that appellant's points of error should all be overruled and the judgment of the trial court affirmed and it is so ordered.